UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CARLTON MORRIS, SR.                                    CIVIL ACTION

VERSUS                                                 NO. 14-1016

ACADIAN AMBULANCE SERVICES, INC.                       DIVISION "3"

## ORDER

Before the Court is Defendant's Motion for Summary Judgment. [Doc. #13].  The Court originally set the motion for oral hearing on March 25, 2015.  Plaintiff filed a motion to continue the submission of the motion, which this Court granted in part, re-setting the oral hearing on April 1, 2015.  [Doc. #16].  Plaintiff filed no opposition to the motion for summary judgment, and the Court thus removed the motion from the oral docket and set it for submission on the briefs.  [Doc. #21].  In the interim, plaintiff filed a Motion to Compel Discovery Responses [Doc. #19] on March 27, 2015.  The discovery deadline was February 20, 2015.  Accordingly,

**IT IS ORDERED** that plaintiff's Motion to Compel Discovery Responses [Doc. #19] is DENIED as untimely.  Plaintiff propounded the discovery requests on the date of the discovery deadline and did not file the motion to compel until March 27, 2015.  No party has moved to continue the deadlines in this lawsuit, the motion to compel reveals no good cause to extend them, and good cause is required by the Scheduling Order.  Plaintiff wholly fails to provide good cause

as to why he could not have propounded the discovery requests before the discovery deadline.[1]

Having reviewed Defendant's Motion for Summary Judgment [Doc. #13], the lack of opposition, and the case law, the Court rules on the motion for summary judgment as follows.

## I.   Background

The following facts are taken from the affidavits submitted in support of defendant's motion for summary judgment because Morris filed no opposition.   Defendant Acadian Ambulance Services, Inc. ("AASI") operates an ambulance company that provides emergency response services as well as medical transport services via its vans. AASI hired plaintiff Carlton Morris, Jr. (male) as a wheelchair van operator in AASI's Gretna division on January 31, 2011.  [Doc. #13-3 at ¶ 2].  On November 11, 2011, AASI promoted Morris to a newly- created position of Van Supervisor.  Kelly Legania (female), Operations Manager, recommended his promotion to that position, and Steve Kuiper, Vice President of Operations, approved the recommendation.  [Doc. #13-3 at ¶ 3; Doc. #13-4 at p. 28].

Shortly after his promotion, Legania noted some shortcomings in Morris's performance as a supervisor that she decided would require coaching and education.  [Doc. #13-3 at ¶ 4]. Among the shortcomings that Legania noted noted were poor communication skills (both verbal and written), inconsistent application of policy and procedure, and failure to follow up for time-sensitive deadlines. [*Id.* at ¶¶ 5, 6 & 7].

With regard to his poor communication skills, Morris consistently used improper grammar and poor sentence structure. [*Id.* at ¶ 5].  He was encouraged to, and did attend an eight-hour

---

[1]     Construing the motion to compel as one filed under Rule 56(d) – in order to obtain discovery to oppose a motion for summary judgment – the Court notes that Morris failed to file the affidavit or declaration required by the rule. Fed. R. Civ. P. 56(d).

grammar course provided by AASI in an effort to improve that deficiency.  [*Id.*].  Legania instructed

him to let her review any e-mails he planned on sending out to employees or the management team.

[*Id.*].  Morris failed to follow that instruction during his tenure as supervisor.  [*Id.*].

As to his inconsistent application of policy, Morris failed to demonstrate any sense of

urgency in holding any of the van drivers accountable for their uniform violations, tardiness,

absenteeism, and overall appearance, including inappropriate facial hair and failing to wear the

proper uniform or footwear.  [*Id.* at ¶ 6].  And as to his lack of follow-up, Morris regularly failed to

ensure that employees under his supervision completed necessary certifications on a timely basis.

[*Id.* at ¶ 7].

At this time, Legania did not formally discipline Morris.  [*Id.* at ¶ 8].  Instead, she decided

to deal with Morris's  shortcomings by using "teaching moments" because it was her desire to see

him be successful as a supervisor. [*Id.*].  Legania, consistent with AASI's management philosophy,

preferred a positive approach to improving performance when possible. [*Id.*].  Legania asked Field

Training Supervisor Chuck Benedict to review all van-orientation documents and procedures with

Morris so that he could take over the new-hire orientation process. [*Id.* at ¶ 9].  The hope was that

since the van-supervisor position occupied by Morris was a newly-created position, Morris could

take over the position of Field Training Supervisor from Benedict.  [*Id.*].

Because Morris was also responsible for van operators' schedules, Legania also asked

Operations Coordinator Mindy Hill to provide one-on-one training to Morris to teach him how to

navigate the AASI Crew Scheduler program. [*Id.* at ¶ 12]. Operations Supervisor Keenan Rogers

also provided several sessions of payroll training to Morris, including weekend training. [*Id.* at ¶¶

14, 15].  Rogers provided Morris with additional training for six months. [*id.* at ¶ 17].  Despite these

3

efforts, however, Morris never fully grasped the payroll processes as was demonstrated by his inability to complete his portion of payroll without assistance from Rogers or other members of the management team. [*Id.* at ¶ 16].

Morris also participated in a series of leadership training sessions called Uncommon Leadership, provided by AASI through Human Dynamics, Inc. [*Id.* at ¶ 18]. Morris attended all of the training sessions related to this program, from June 2012 through October 2012. [*Id.*]. In addition, Morris attended AASI's annual Acadian Leadership forum, a one-day strategic information and motivation session. [*Id.* at ¶ 19].

Morris also participated in a class designed for new supervisors, called OS 101. [*Id.* at ¶ 20]. This class is designed to teach the timely and consistent application of any and all policies and procedures of AASI. [*Id.*]. Morris also attended bi-weekly operations meetings with the management team of AASI, in which operational issues and disciplinary actions that may have been taken in the prior two weeks were discussed to ensure that members of management were consistent and working as a team. [*Id.* at ¶ 21]. During these meetings, the other members of management, including Legania, embraced Morris and attempted to help him as much as possible. [*Id.* at ¶ 22].

Legania began to notice that Morris became argumentative when he disagreed with a policy or procedure. [*Id.* at ¶ 23]. For example, the vans under his supervision were notorious for late log-ons. [*Id.*]. AASI policy states that an employee must be logged on for their shift and ready to take a call at the start time of their shift. [*Id.*]. However, when van employees assigned to Morris would not be properly logged on, Morris would call the communications center and become argumentative with the dispatcher in an effort to defend the employee. [*Id.*].

As a van supervisor, Morris participated in bi-weekly van-safety committee meetings. [*Id.*

at ¶ 24]. Topics of discussion included, but were not limited to, safe loading and unloading of patients in wheelchairs onto and off the van, patient security, review of operational and safety issues with requests to disseminate information to the staff as educational, orientation of new employees, and policies and procedure. [*Id.*]. In addition, Morris continued to receive training, coaching and support from the operations team. [*Id.*]. For AASI's annual van inspections, Legania assigned Operations Supervisor Tyra Haynes to assist Morris, as she had assisted with these inspections before and had also been in charge of van operations before the dedicated position was created. [*Id.* at ¶ 25]. While preparing for the vans to be inspected, Haynes noted that Morris needed assistance to accomplish required tasks in his management role. [*Id.* at ¶ 26].

Morris was responsible for approximately 30 employees, all of whom required their CPNC certification in order to pass inspection. [*Id.*]. During the inspection process, Legania learned that there were several employees, some that had been employed close to a year, who still had not received their certification. [*Id.* at ¶ 27]. Once inspections were complete, Legania met with Morris and advised him that Haynes would be assisting him with getting his employees on board and following through with the process. [*Id.*].

Legania later met with Morris and Haynes to see where additional help may be required. [*Id.* at ¶ 28]. Morris verbally agreed to allow Haynes to assist him in getting the employees back on track with the CPNC process. [*Id.*]. However, whenever Haynes offered her assistance, Morris became defensive and angry. [*Id.*]. Once Legania intervened, she discovered that Morris's poor attitude was influenced by Haynes' ability to gain respect from the van operators, something with which he had struggled. [*Id.* at ¶ 29].

AASI supervisors are also responsible for conducting annual performance appraisals ("PAs")

for the employees that report to them. [*Id.* at ¶ 31].  They are assigned deadlines for completion, and a date is set for a PA Review. [*Id.*].  In 2013, this two-day process was scheduled for Wednesday, February 13, 2013 and Friday, February 15, 2013 (over a year after AASI had promoted Morris to supervisor). [*Id.* at ¶ 32]. These days allow all of the supervisors to give input and ensure that each employee receives a fair evaluation. [*Id.*].  Because the Gretna, Louisiana area consists mostly of medics, Legania advised Morris that he would be first to present his van-driver employees and be excused for the remainder of the review. [*Id.* at ¶ 33].  She also told him that he could take off the second day.  [*Id.*].  As they settled into the meeting room and prepared to begin, she asked Morris if he was ready. [*Id.*].  Morris stated that he had not completed any of his appraisals. Legania then extended his deadline to Friday. [*Id.*].

As Legania was preparing to leave the office the following evening, she received an e-mail and phone call from the AASI Risk Manager, Kent Guidry.  [*Id.* at ¶ 34].  He advised her that one of the van operators had been operating a company vehicle with a suspended license. [*Id.*].  Legania went to Morris's office to show him the information that she had received and advised him to remove the employee from the schedule until he could provide a letter of clearance from the Department of Motor Vehicles. [*Id.*].  As she turned to exit, Morris stated, "There's something else you need to know about him. He hit a man's car two weeks ago with one of the vans."  [*Id.*]. Legania asked Morris how long he had known about the accident and why had he not reported it to anyone. [*Id.*].  Morris stated, "The guy called me yesterday when we were doing PA's and I didn't get a chance to call him back." [*Id.*].  Legania informed Morris that he should have immediately reported the incident to her and that Risk Management should have also been notified.  [*Id.*].  Morris stated that the incident "slipped his mind." [*Id.*].  When Legania met with the employee, who was

6

subsequently terminated for failure to report the accident, he informed her that Morris had contacted

him a week earlier to inquire about the incident. [*Id.* at 35].  Legania advised Morris to immediately

contact the caller and gather all of his information so that she could report the incident to Risk

Management the next morning. [*Id.*].

On Friday, February 15, 2013, Legania asked Morris if he had followed through with the

information that she had requested, and he replied, "No."  [*Id.* at ¶ 36].  As the management team

was preparing to leave for PA review, Legania advised Morris that he needed to contact the caller

immediately and provide her with feedback as soon as possible.  [*Id.*].  Legania also advised him that

he would not be participating in the PA review and that he could go home for the rest of the day.

[*Id.*].  In addition, Legania asked Morris for all of his PA materials, so that she could personally

handle them with the group.  [*Id.*].  Finally, Legania asked Morris if he had contacted his employees

to extend the deadline. [*Id.*].  Morris replied that he had not.  [*Id.*].  Legania instructed him to

complete that task as well and that they would be meeting the following Monday to discuss these

performance issues. [*Id.*].

As Legania began to go through stack of PAs that Morris had allegedly completed, she

noticed that none of them was actually complete. [*Id.* at ¶ 37].  Once again, Morris had failed to meet

an assigned deadline. [*Id.*].  Legania had also provided Morris with a flash drive to store all of his

PA information.  [*Id.*]. This was also incomplete. [*Id.*].  When Legania reviewed the forms that were

marked complete, she noticed several inconsistencies.  [*Id.*].  For example, there are six areas of

competencies that are scored from a range of 1 (poor) to 5 (excellent). [*Id.*].  Under the Attendance

section, one employee was tardy four times and had over five absences in a 365 day period; this

employee had received a score of 4.  [*Id.*].  After Legania reviewed all of Morris's employees and

their profiles, she found many other contradictions.  [*Id.*].  There were disciplinary profile entries with no supporting documentation and vice versa.  [*Id.*].  Legania immediately brought this to the attention of her immediate supervisor Kuiper.  [*Id.*].  Legania also outlined to Kuiper the operational deficiencies that had been accumulating throughout Morris's tenure as supervisor.  [*Id.*].  As a result, they made the decision to demote Morris.  [*Id.*].  Legania contacted Morris that same evening and asked him to meet her on Monday morning.  [*Id.*].

On Monday, February 18, 2013, Legania met with Morris and advised him of her decision to dissolve the supervisory position that had been created and to move him out of his supervisory role.  [*Id.* at ¶ 38].  She told him that he was welcome to stay with AASI if he was willing to return to his prior position operating a van, but that he had not performed up to expectations as a supervisor.  [*Id.*].  She explained to him that AASI would not be promoting anyone else from the van department to replace him, but that Tyra Haynes would be stepping in to cover the vans as part of her current duties just as she had covered those duties in the past.  [*Id.*].  Legania and Morris also discussed his performance issues in the past, during which Morris attempted to justify his actions.  [*Id.*].  Morris was upset by the news.  [*Id.* at ¶ 38; Doc. #13-4 at pp. 33-36].  Karen Lester, Operations Coordinator, attended this meeting as a witness.  [Doc. #13-3 at ¶ 42].

Once Morris left Legania's office, she began to receive numerous e-mails and phone calls from him.  [*Id.* at ¶ 38].  In the first e-mail, he requested documentation of the conversation that they had had that morning or a copy of the written counseling notice.  [*Id.*].  Legania advised him that there was no written counseling notice because he was not counseled – he was demoted. [*Id.*].  AASI does not consider a demotion to be a disciplinary matter but a matter involving an employee's inability to perform adequately in a position. [*Id.*].  At his deposition, Morris testified that at the

meeting of February 18, 2013, he was told that his position was being dissolved, and he also testified that he opted to take Legania's offer to keep him on as a van driver. Morris admitted that he was advised that he was demoted in a later meeting. [Doc. #13-4 at p. 108].

After AASI demoted Morris, effective February 18, 2013, Legania learned of several other managerial deficiencies that involved him.  [Doc. #13-3 at ¶ 39]. On February 19, 2013, Legania scheduled a meeting with all of the van employees to inform them of the management change. [*Id.* at ¶ 40]. After the meeting, several employees expressed that they had "worked out a deal" with Morris regarding their schedule. [*Id.*].  During the interview process, Legania had personally explained to every applicant that due to the nature of its business, AASI can not make any promises as far as the schedule is concerned.  [*Id.*].  At the conclusion of this meeting, Legania for the first time learned that Morris had essentially reversed company philosophy by allowing favoritism with scheduling. [*Id.*].

In addition, after Morris's demotion, Haynes received a call from a woman whose mother's foot had been injured when a van operator allegedly rolled over it. [*Id.* at ¶ 41].  The woman stated that the incident occurred in September of 2012.  [*Id.*].  She stated that she had been in contact with Morris, who had advised her that AASI would be responsible for "all of her medical expenses." [*Id.*].  Morris had not reported the incident to Legania, nor was any documentation completed on the incident as required by standard company policy and procedure. [*Id.*].

Morris continued to work for AASI until he voluntarily resigned on June 28, 2013.  [Doc. #13-4 at pp. 61-62].  Morris received a written evaluation from  Legania on March 28, 2013, which covered approximately 11 months while he was still a supervisor. [*Id.* at Ex. 7].  The evaluation rated him below average in four categories that were important skills for supervisors

(Attitude/Motivation of Others; Professionalism; Procedure Compliance; Communication); excellent in one category (Measurements/Statistics); and above average in three categories (Quality of Work/Job Knowledge/Patient Care; Planning/Shift Preparedness/Vision; and Safety). [*Id.*]. Before he left AASI, filed a charge with the Equal Employment Opportunity Commission ("EEOC") in which he alleged gender discrimination with regard to his demotion. [*Id.* at Ex. 4]. After investigating the charge, the EEOC issued a Dismissal of the Charge on or about February 3, 2014 and provided Morris with his Notice of Right to Sue. [*Id.* at Ex. 5]. Morris then initiated this lawsuit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. ¶ 2000e *et seq*.

## II.  Law and Analysis

### A.  Summary Judgment Standard

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in [his] favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325;  *Lavespere*, 910 F.2d at 178. The burden then shifts to the nonmoving

party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See Celotex*, 477 U.S. at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial. *See id.* at 325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

**B.     Title VII**

Under the traditional *McDonnell Douglas* burden-shifting test, a Title VII plaintiff who alleges gender discrimination must show that (1) he is a member of a protected class; (2) he was qualified for the position sought; (3) he was subject to an adverse employment action; and (4) he was replaced by someone outside his protected class or was treated less favorably than other similarly situated employees outside his class. *Fahim v. Marriott Hotel Servs.*, 551 F.3d 344, 350 (5th Cir. 2008) (citations omitted); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Once the employee offers sufficient evidence to establish a *prima facie* case of unlawful discrimination, it becomes the employer's burden to produce evidence that it had legitimate, nondiscriminatory reasons for its actions. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993). If it does so, the "presumption [of discrimination] raised by the prima facie case is rebutted." *Id.* (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981)) (alteration added by this Court). The burden of persuasion – "the ultimate burden" – then moves to the employee to prove that the employment action in question was taken at least in part because of his sex. *Id.* In this phase of the case, the employee ordinarily attempts to prove that the employer's articulated reasons are pretextual, thus raising the inference that sex was a motivating factor for the adverse employment action. *Brandt v. Shop 'n Save Warehouse Foods, Inc.*, 108 F.3d 935, 938 (8th Cir. 1997).

11

Assuming for the purpose of this motion that Morris can make out a *prima facie* case of discrimination – which this Court does not concede given that there is no opposition to the motion for summary judgment but passes over for the sake of judicial economy – the Court finds that Morris can not prove that the employment action in question was taken at least in part because of his sex.

At his deposition, Morris testified as follows:

> Q: Okay. And why do you think that Acadian violated the law?
> A: Discrimination with me and the position.
> Q: And what was that discrimination based on?
> A: Discrimination I believe was based on a female, a friend coming in and fulfilling the position that I had and wasn't did correctly as far as getting rid of my position.
> Q: So, its based on friendship, is what you're claiming?
> A: Yes.
> Q: There was preferential treatment of a friend?
> A: Yes.
> Q: Alright. Is there any other basis for your claim?
> A. No.

[Doc. #13-4 at pp. 19-20].

> Q: Okay. And what was that discrimination again? I missed that. Is it because you felt
> that that Tyra Haynes was a friend of hers?
> A: Yes.
> Q: Alright. Are you claiming that had anything to do with gender?
> A: I can't recall it be gender or friendship or they just wanted her in that position.
> Q: You don't know?
> A. No.
> . . . .
> Q: And again you've referenced that the basis of your lawsuit is you feel that Miss Legania was favoring her friend. And you say she's a close friend of Miss Legania. Explain that, let's go there talk about that. What do you feel that she unfairly favored Miss Haynes over you?
> A: Friends go out to eat together, just close friends like say, for instance, I have a friend, we go out to eat, we closely do everything together, share things together.
> Q: Okay. So, you feel that the basis for her selection or putting Miss Haynes in, not into
> the direction position but to take over that duty you had held was based on her friendship?

A: That's what I believe.

[*Id.* at pp. 42, 45-46].  The only evidence before this Court, then, reveals that even Morris believes that he was demoted because Legania wanted to replace him with a personal friend, not because he was a male.

It is well settled as a matter of law that preferential treatment of friends, relatives, or even paramours does not establish a violation of Title VII. The Eighth Circuit Court of Appeals has directly addressed the issue in *Brandt v. Shop 'N Save Warehouse Foods, Inc.*, 108 F.3d 935 (8th Cir. 1997).  There, the court considered a gender-discrimination issue in which the female plaintiff claimed that she was unlawfully denied consideration for a different job position because the hiring member of management had favored an "old friend" rather than considering her. *See id.* at 937.  The court concluded that it did not need to consider the defendant's challenges to various aspects of the plaintiff's *prima facie* case since it concluded as a matter of law that the plaintiff did not prove that her gender was a motivating factor for the adverse employment action. *See id.* at 938. Assuming here that friendship was the motivating factor as Morris testified at his deposition, it was not unlawful under Title VII.  The Eighth Circuit explained:

> The evidence shows that Frentzel took advantage of his 'network' to land the apprentice meat cutter position, and that Dougherty obliged his friend by supporting his application for the position, if not creating a tailor-made position for Frentzel. We do not condone the exclusion of Brandt [plaintiff] as a viable candidate on this basis. But it is not intentional sex discrimination for Dougherty to hire an unemployed old friend who happens to be male, without considering an applicant who is neither unemployed nor an old friend and happens to be female. An employer's business decision concerning hiring need not be a good decision to withstand a challenge for sex discrimination; it is enough that it not be motivated by the gender of the employee who is adversely affected by the decision. . . . [S]uch actions, although unfair from the standpoint of Brandt and persons of either gender who are similarly situated, are not a violation of . . . federal laws prohibiting sex discrimination in employment.

13

*Id.* at 938-39.  Indeed, "the employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination."  *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995).

Here, Morris has come forward with no evidence to prove that the employment action in question was taken at least in part because of his sex.  Legania's affidavit outlines in detail Morris's poor job performance in his supervisory position.   And Morris himself believes that Legania demoted him only to replace him with a friend.  Such activity is not violative of Title VII

Other courts have reached similar conclusions when confronted with fact patterns similar to those in *Brandt* and those here. In *Buenrostro v. Flight Safety International, Inc.*, the court considered a claim that a supervisor favored his alleged paramour to the detriment of the plaintiff. No. Civ. A. SA-99-CA0819, 2001 WL 674171 (W.D. Tex. Mar. 2, 2001). The court held: "Alleged favoritism to a paramour generally has been held not to constitute discrimination in violation of Title VII because the alleged discrimination is not based on plaintiff's sex. 'Title VII does not protect employees from hostile conduct that is not based on their protected status.'"  *Id.* at *6.  Even the EEOC Policy Guidance on Employer Liability under Title VII for Sexual Favoritism provides in relevant part: "An isolated instance of favoritism toward a paramour (or spouse, *or a friend*) may be unfair, but it does not discriminate against women or men in violation of Title VII, since both are disadvantaged for reasons other than their genders" EEOC Notice No. 915-048, at *2 (Jan. 12, 1990) 2001 WL 674171, at *7 (emphasis added); *see also Harvey v. Chevron U.S.A.*, 961 F. Supp. 1017 (S.D. Tex. 1997); *Rowe v. Jewell*, – F. Supp. 3d –, 2015 WL 631350, at **14-15 (E.D. La. 2015) (both discussing the same principals discussed in *Buenrostro* and both citing the EEOC guidelines

14

mentioned above.).

For the foregoing reasons, the Court finds that Morris can not demonstrate that AASI demoted him because of his gender.  There is no evidence in the record to suggest otherwise. Indeed, the record is replete with non-discriminatory reasons for Morris's demotion, and Morris has failed to come forward with any evidence to rebut it.[2]

**III.     Conclusion**

For the foregoing reasons,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment [Doc. #13] is GRANTED.

New Orleans, Louisiana, this 2nd day of April, 2015.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

---

[2]     Because the Court resolves the motion on this issue, it does not address the other arguments raised in defendant's motion.

15